**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

|  |  |  |
|---|---|---|
| UNITED STATES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 2:07-CR-121 |
| v. | ) | |
| | ) | |
| CHAD WICKLINE and | ) | JUDGE ALGENON MARBLEY |
| DAN WICKLINE | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## <u>DEFENDANTS' JOINT MOTION TO DECLARE A MISTRIAL</u>

Defendants Chad Wickline and Dan Wickline (hereinafter the "Wicklines"), by and through their respective attorneys of record, The Bernhoft Law Firm, S.C. and Ross M. Babbitt Co. LPA, file this joint motion to declare a mistrial in this case.

The established precedents and procedural protections of the United States Constitution and the Federal Rules of Evidence exist to insure an actual trial on the merits. This Court's apparent consternation with defense counsel's "procedural" objections and stated desire for a "trial on the merits" unfortunately overlooks that these procedural rules are designed *to insure* a trial on the merits. Without them, defendants get trials with streaming perjury, impermissible hearsay, and unbounded unfairly prejudicial evidence, tainting the trial beyond remedy or repair for any meaningful trial on the merits. In sum, they get exactly what this trial has become.

An immediate ruling for mistrial is not only warranted but necessary, as set out in greater detail below.

1

I.    **A MISTRIAL IS AN APPROPRIATE REMEDY TO SEVERELY PREJUDICIAL ERROR.**

A defendant seeking a mistrial need only show that there is severely prejudicial error in the record to meet his burden of persuasion. *See United States v. Dinitz*, 424 U.S. 600, 610 (1976) ("In the event of severely prejudicial error a defendant might well consider an immediate new trial a preferable alternative.") This is a lower standard than "manifest necessity", which applies in other procedural postures. The rationale for the lower standard when requested by a defendant facing prosecution conforms with the procedural safeguards in place in our judicial system.

Throughout this trial, this Court's unfortunate misunderstanding of the rules of evidence has allowed unfairly prejudicial evidence, perjury, and inadmissible hearsay to be presented to the jury virtually on a daily basis. These materials have been proffered to the jury because of the government's, and this Court's, misinterpretation and misapplication of Rule 106, Rule 803(6), and Rule 403. It is by reference to these three rules of evidence that the Wicklines frame their motion for mistrial.

II.   **THIS COURT HAS MISINTERPRETED RULE 106 WITH THE EFFECT OF ALLOWING THE JURY TO SEE IMPERMISSIBLY INCOMPLETE SETS OF DOCUMENTS AND DEPRIVING THE WICKLINES OF AN OPPORTUNITY TO CONTEXTUALIZE THE GOVERNMENT'S PIECEMEAL PRESENTATION.**

A.   *Rule 106: Context & Completeness Evidence is Not Limited to Intrinsic Evidence*

This Court has consistently misunderstood and misapplied Rule 106, a rule designed to prevent perjured testimony and misleading inferences. The Court admitted letters, correspondence and exhibits into the trial without the necessary context from associated documents, correspondence and exhibits. This opened the door to repeated perjury and impressing on the jury a permanent misimpression branded in the jury's mind, avoidable had the

2

Court properly applied the rules of evidence, in particular in this instance, Rule 106 of the Federal Rules of Evidence.

Rule 106 includes two portions:  (a) when a part of a writing or recorded statement is introduced, then the adverse party may introduce any other part thereof which merely "ought in fairness to be considered contemporaneously with it";  **and** (b) when a writing or recorded statement is introduced, then the adverse party may introduce "any other writing or recorded statement" which "ought in fairness to be considered with it."  As the rule itself clearly states:

> When a *writing* or *recorded statement* or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it.

Fed. R. Evid. 106.

The Court has consistently misunderstood and misapplied the rule, believing the rule only applies when a part of a writing or recorded statement is introduced and only allowing another part of the same writing or recorded statement to be introduced.  This directly conflicts with the plain language of the rule.  Indeed, this common misinterpretation of the rule would cut out half the rule, having the rule read as follows:

> When a ~~*writing* or *recorded statement*~~ or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part ~~or any other writing or recorded statement~~ which ought in fairness to be considered contemporaneously with it.

*Id*.

The Court's interpretation impermissibly blue-lines half the rule.  The plain language of the rule follows two hundred years of application from the English common law, one hundred years of application from the United States Supreme Court, and half a century of law since the codification of the rules in the appellate courts.  *See Crawford v. United* States, 212 U.S. 183,

3

201 (1909) (reversal of verdict due to district court error in interpreting rule of completeness which required admission of a separate letter written by criminal defense lawyer after admission of letter accusing client of stealing evidence since the separate letter responded to the admitted letter);  *United States v. Maccini*, 721 F.2d 840, 844 (1st Cir. 1983) (both prior grand jury testimony and prior trial testimony of witness could be read to "complete" the evidence under Rule 106 even though only the witness' prior trial testimony was read);  *Phoenix Associates III v. Stone*, 60 F.3d 95, 103 (2nd Cir. 1995) (Rule 106 required district court to admit different documents whenever different documents help explain the admitted document or help prevent misleading impression from admitted document;  work papers used by accountant after admission of financial statement since work papers contextualize the financial statement, even though work papers were completely separate documents, as work papers disclosed that information was given to the accountant, despite accountant's failure to record same on financial statement);  *United States v. Marin*, 669 F.2d 73, 82-83 (2nd Cir. 1982);  *United States v. Soures*, 736, F.2d 87, 91 (3rd Cir. 1984);  *United States v. Sweiss*, 814 F.2d 1208, 1211-12 (7th Cir. 1987);  *Brewer v. Jeep Corp.*, 724 F.2d 653, 657 (8th Cir. 1983) (district court had to admit a written report of film makers when the film itself was introduced to properly complete the evidence);  *United States v. Soulard*, 730 F.2d 1292, 1301 (9th Cir. 1984) (Rule 106 required district court introduce independent evidence of other sub-franchisees in order to prevent misleading impression of government exhibits concerning sub-franchisee at issue in criminal tax case);  *United States v. Sutton*, 801 F.2d 136, 1369 (D.C. Cir. 1986) (Rule 106 requires admission of any other statements of alleged co-conspirators when such statements prevent distortion of statements admitted under co-conspirator hearsay exception and explain relationship between parties).

4

A completely separate document must be included at the time to avoid misimpression. Indeed, the drafters of the rule made this evidently clear at the House Hearing adopting the Rule. "To illustrate, a reply ought ordinarily to be considered with the original letter to which it is directed, rather than being separated by a matter of hours, days, or even weeks." *Memorandum of Committee on Rules of Practice & Procedure*, 1 House Hearings, pp. 51, 55.

That is why a tape recording of a conversation in August could be introduced right at the time of the government's introduction of a separate tape recording from a separate September conversation under Rule 106 to explain and contextualize the admitted tape recording:

> However, after Sweiss' cross-examination it became clear that the prosecution was focusing on the portion of the September tape that demonstrated that Sweiss knew that Eddie Al-Abbasi was a corroborating witness. At that point, the defense could have offered portions of the August tape recording again….The August tape, if edited, may have aided the jury in understanding the September conversation.

*Sweiss*, 814 F.2d at 1213.

This has been the established law of the rule of completeness for a century. As the Supreme Court explained in reversing a verdict from a district court's error:

> It is plain that the letter from the witness Aspinwall to the defendant, making the charge that defendant took the letters, as above stated, was put in evidence by the government for the purpose of endeavoring to show that the defendant had surreptitiously taken evidence which might possibly be used against him upon his trial. The response of defendant to such letter should have been admitted as explanatory of the letter of accusation. Without the letter of explanation the other letter should not have been received.

*Crawford*, 212 U.S. at 199.

The leading and most judicially cited scholastic treatise on evidence points out the same fact evident from the text of the rule itself. As the treatise penned by the late Professor Charles Wright explained, "in federal courts and most states, the opponent can use **separate documents**

5

for completeness" under Rule 106.  Wright, Charles & Graham, *21A Federal Practice & Procedure Evid.2d* § 5078 (2008) (emphasis added).

Every leading scholar recognizes the same necessary interpretation of the rule – separate documents and recordings are admissible, and even necessary, under Rule 106 to protect against the evils the rules is intended to cure.  *See* 1 Saltzburg, Martin & Capra, *Federal Rules of Evidence Manua*l, 8th ed.2002, p. 106-3 (Rule 106 requires admission of letter which triggered proponent's reply letter, even though separate letter);  Wigmore, *Code of Evidence*, 3d ed. 1942, p. 371-379.  As Wigmore equally explained: "when a letter is read, the answer may be given; and when a detached act, declaration, conversation or writing is given in evidence, any other act, declaration, conversation or writing, which is necessary to make it understood, may also be given in evidence."  *Id.*

Any of the following grounds permit contemporaneous admission of the completing document, even if that document is a completely separate document -- the separate document is "required to be read" whenever it either a) explains the admitted exhibit, b) places the admitted exhibit in context, c) avoids the admitted exhibit misleading the jury, or d) simply insures a fair and impartial understanding of the admitted exhibit.  *See Sweiss*, 814 F.2d at 1211-12 (citing *Marin*;  quoting *Sores*).  The burden on the defense is a "minimal burden that can be met without unreasonable specificity."  *Id*. at 1212.

The rule has to read as it is written in order to protect against the evils it seeks to exclude from the trial, an evil pervading this trial – unvarnished, untrammeled continuous perjury and misleading prejudicial inferences, with facts stripped of their context, emails stripped of their precursors and replies, narratives with chronological and substantive potholes littered throughout.  As no less an authority than Euripides once warned, it is too easy with partial

6

introduction of exhibits – especially email chains and partial web pages in a mail fraud case – to have "told the truth, but used it like a lie."  7 Blinka, *Wisconsin Practice: Wisconsin Evidence*, 2d ed.2001, p. 43.  Here, the follow up questions invited outright lies by the witness, lies only permitted by the exclusion of the contextualizing evidence.  As the late professor instructed, this is severely prejudicial error:  "**by the time the opponent can introduce the complete statement, the jury may have so assimilated the truncated version that the later repair is ineffective.**"  Wright & Graham, *21A  Fed. Pract. & Proc. Evid.2d*  § 5072 (2008) (emphasis added).

>  B.  *Throughout This Trial, The Government's Presentation Of Incomplete Sets Of Documents, And This Court's Denial Of The Wicklines' Right To Complete Those Sets, Has Led To Numerous Instances Of Severely Prejudicial Error.*

Throughout these proceedings, the Wicklines objected to the government's presentation of incomplete sets of documents to the jury.  In response to their objections, the Wicklines have been queried by the Court whether the single document presented by the government was intrinsically correct, as a "complete" copy of the document at issue.  And this Court has ended its Fed. R. Evid. 106 analysis when the Wicklines have ceded that the government's proffered document is, taken in isolation, a complete copy of the discrete document from the record.  This analysis is wrong, and has led to a laundry list of severely prejudicial errors on the record.

Examples of the prejudice injected into the record here include: misleading and perjured testimony implying the legal service providers involved, Hawkins, Taylor, and Burgess, disapproved of the product when it was they who created the project; implying remedial action or discussion did not take place concerning customer complaints or lawyer issues, when extensive communications took place concerning the same; implying the web site "never

changed" and always had "100%" successful on it, when that was knowingly false testimony the prosecutor refused to correct as was her duty, as just a few of the examples.

Compounded by the 803(6) errors and 403 errors below, the Court's admonition to counsel to not raise objections without factual foundation and discouraging any further "procedural" objections, the Court's Rule 106 errors allowed perjury and unfairly presented evidence, stripped of proper context, to further and irreparably taint the jury.

III.   **THIS COURT'S MISAPPLICATION OF THE HEARSAY RULES HAS FURTHER INJECTED SEVERELY PREJUDICIAL ERROR INTO THE RECORD.**

A.   *Rule 803(6): Statements of People Not Part of the Business Cannot Be Introduced As "Business Records" Exception to Hearsay*

A similar problem pervades the Court's continuous misapplication of the hearsay rule and the business records exception to that rule. The Court has introduced records of BMW, an internet service provider, a mail service store, and emails – records that were made by someone who was not part of BMW, not part of the internet service provider, not part of the mail service store, and not a part of Liberty Resources, as "business records." The Court's belief that almost anything merely found in a business file is a business record exception to the hearsay rule is simply in error.

The most significant portion of the rule – intended to preclude hearsay from coming in guised as business records – is any statement contained within any record that was not made by one who is part of the business.

> The difficulty is that despite its language, **the business records exception does not embrace statements contained within a business record that were made by one who is *not* a part of the business if the embraced statements are offered for their truth.** The classic case is Johnson v. Lutz, 170 N.E. 517 (N.Y. 1930), which excluded an unredacted police report incorporating the statement of a bystander (even though the police officer recorded it in the regular course of business) because the informant was not part of that business. The Advisory

8

Committee Notes to Rule 803(6) cite *Johnson v. Lutz* and make clear that the rule is intended to incorporate its holding. *Johnson v. Lutz* is not a technical formality but follows directly from the very rationale for the business records exception. When a clerk records the receipt of an order over the telephone, the regularity of the procedure, coupled with business incentives to keep accurate records, provide reasonable assurance that the record thus made reflects the clerk's original entry. Thus the business record, although an out-of-court statement and therefore hearsay, is admitted without calling the clerk to prove that the clerk received an order. *See generally 2 McKormick on Evidence sec. 286 (4th ed. 1992.* **But no such safeguards of regularity or business checks automatically assure the *truth* of a statement *to* the business by a stranger to it, such as that made by the bystander to the police officer or that made by the money sender who gave the form containing his name, address, and telephone number to Western Union**. Accordingly, the *Johnson v. Lutz* gloss excludes this "outsider" information, where offered for its truth, unless some other hearsay exception applies to the outsider's own statement. This gloss on the business records exception, which the Federal Rules elsewhere call the "hearsay within hearsay" problem, Fed.R.Evid. 805, is well-settled in this circuit. Other circuits are in accord. *See 5 Weinstein's Federal Evidence* § 803.11[4], at 803-72 to 803-73 & n. 29 (2d ed.1999).

*United States v. Vigneau*, 187 F.3d 70, 75-76 (1st Cir. 1999) (emphasis added)

Hence, the entry of a hotel customer in a hotel ledger cannot be admitted into evidence as a business record exception to hearsay. *See United States v. McIntyre*, 997 F.2d at 687, 700 (10th Cir. 1983). The sender's name, address and telephone number on a business form equally should not have been admitted for their truth. *See United States v. Cestnik*, 36 F.3d 904, 908 (10th Cir. 1994). Third party information in any business record is not admissible because the information is not from a person that has a business duty to report – such as statements by customers of a business, whether filled out on forms, or not. Hence, statements to a police officer as recorded by the police officer in a report made at the time of the statement and close to the events is simply not admissible because the third party witnesses had no business duty to report the information themselves. *See United States v. Pazsint*, 703 F.2d 420 (9th Cir. 1983).

The Sixth Circuit, citing the First Circuit string of precedent that led to *Vigneau,* as well as citing the same Professor McKormick and his treatise on evidence, statements made by

someone other than a member of the business cannot be admitted even if the statements reside

within a record kept by the business.  *See United States v. Graham*, 391 F.2d 439, 447 (6th Cir.

1968).

> In a relatively recent case in which the issue of the admissibility of a police
> accident report containing possible hearsay statements by bystanders arose, it was
> stated: "These acts were intended to make admissible records which, because
> made pursuant to a regular business duty, are presumed to be reliable. The mere
> fact that recordation of third party statements is routine, taken apart from the
> source of the information recorded, imports no guaranty of the truth of the
> statements themselves. There is no reason for supposing an intention to make
> admissible hearsay of this sort. So to construe these statutes would make of them
> almost limitless dragnets for the introduction of random, irresponsible testimony
> beyond the reach of the usual tests for accuracy." *Yates v. Bair Transport, Inc.*,
> 249 F.Supp. 681, 683 (S.D.N.Y. 1965), citing Note, Revised Business Entry
> Statutes: Theory & Practice, 48 Colum.L.Rev. 920, 926-27 (1948). The reasoning
> expressed in *Yates* is sound and equally appropriate here. It is also in accord with
> the rule in this Circuit as set forth in *Schmeller v. United States*, 143 F.2d 544
> (1944). In that criminal action, where business records containing hearsay were
> admitted into evidence under section 695, Title 28 U.S.C., this court stated (p.
> 550): Section 695 in no way repealed the ordinary requirements of relevancy and
> competency. The District Court should have examined and ruled upon each paper
> separately, and should have excluded the hearsay and other incompetent evidence.
> *See also Gencarella v. Fyfe*, 171 F.2d 419 (1st Cir. 1948), where the court held
> that the admission into evidence of an entire police accident report which
> contained statements based upon the officer's own observations as well as
> **witnesses' hearsay statements** was erroneous. In accordance with the foregoing,
> it is here determined that a police report is **not admissible** under the Federal
> Business Records Act for the sole purpose of establishing the truth of the **matter
> asserted by a third party** informant.

*United States v. Graham*, 391 F.2d 439, 447-48 (6th Cir. 1968) (emphasis added).

The Confrontation Clause further informs this rule, as "any trial lawyer who has tried to

cross-examine a witness whose story depends on the hearsay statements of others understands

why. These are reasons enough to tread cautiously, quite apart from the Supreme Court's

intermittent reliance on the Confrontation Clause to make the use of hearsay a potentially

constitutional issue in criminal trials."  *Vigneau*, 187 F.3d at 78.

B. *By Permitting The Government To Shoehorn Scandalous Emails From Third Parties Into The Record With The Business Record Exception, This Court Committed Severely Prejudicial Error*.

One document in particular demonstrates both this Court's dramatically incorrect application of the business records exception and the severe prejudice that this misapplication has caused to the Wicklines' defense.  Over the Wicklines' objection, this Court allowed the government to publish to the jury its Exhibit 50-2(bb).  In so doing, this Court injected into the record triple hearsay statements attributed to "federal judges" going to the purported illegality of the Liberty Resources system.  With this one document, the statements of federal judges, federal prosecutors, Michael Burgess, Sam Davis, and unknown others came flowing into the case even though defense counsel has no opportunity to cross-examine those witnesses. Examples include:

- o   Statements of a federal prosecutor and a federal judge to Michael Burgess;
- o   Statements of Michael Burgess to Sam Davis;
- o   Sam Davis statement's to Chad Wickline;
- o   Statements of non-testifying customers to Chad Wickline;
- o   Statements of Rick Alton;
- o   Statements of other supposed co-conspirators, radically expanding and altering the scope of the conspiracy.

The jury has heard extensive evidence, including hearsay in email, BMW documents, internet service provider documents, and hotel bills, surmised by the same scandalous email objected to on hearsay and 403 grounds:

Q:      Who is this e-mail from?
A:      This e-mail is from Michael Burgess.
Q:      And who is Michael Burgess again?
A:      Michael Burgess is the gentleman who represented himself as the attorney for his company to confirm the awards.
Q:      All right. What is he telling Mr. Davis?
A:      You know, basically, that all 1100 files or awards that were submitted to the judge were rejected outright, that his company spent an abundant amount of money that he will not be able to recoup; therefore, he is contemplating shutting his company down.

Q:      All right. Why did he indicate that the awards were not confirmed?
A:       The judge viewed them as a scam.

*Transcript of June 30, 2008*, Testimony of Mike Amato, p.57: 8-21 (reading from email).

Q:      Now let's go on to the second -- what does he say there at the last
        paragraph?
A:      He said, in quotes: ...so these people went out with the credit cards that
        they had themselves applied for, signed their name to get those cash
        advances, stereos, furniture and clothing, computer equipment, etcetera,
        then they found that they couldn't pay the bill. So they decided to arbitrate
        so that they could weasel out of paying these high -- these very legal bills.
        Well, no way in hell they are getting any money for that from this court.
        End quote.
Q:      And was he referencing the awarding of monetary damages there?
A:      Yes, he was.

*Id. at* p.58: 8-21 (reading from email).

This, combined with other emails repeating the statements of customers not subject to
confrontation or unknown people concerning supposed warnings and past histories of unknown
companies comparing the same to Liberty Resources, riddles the hearsay injected into the record.
The combination of the Court's misapplication of Rule 106 and misinterpretation of Rule 803(6)
foreclosed meaningful cross-examination and opened the door to streaming perjury. For his part,
Mike Amato lied repeatedly about the actions and inactions of the Liberty Resources team in
response to various emails, as have most of the customer "victims" – lies critically aided by the
Court's inclusion of inappropriate evidence and exclusion of critical contextualizing evidence.
As examples:

o   The jury hearing, through Govermnet Exhibit 50-2(bb), that a "federal judge" found the
    program a "scam" (the summary phrase of Amato) by allowing in unbridled hearsay
    from the federal judge, relayed through hearsay by Attorney Michael Burgess, relayed in
    turn by hearsay of Sam Davis, rendering the statements *triple hearsay*, without any

opportunity for the defense to cross-examine any of the above, introduced as a "business record" merely because the hearsay was communicated in an email form;

o   The jury hearing, by reference to the same exhibit, that Attorney Michael Burgess called the program a "whole scam" as transmitted through the hearsay of Sam Davis, rendering it *double hearsay*, introduced as a "business record" merely because the hearsay was communicated in an email form;

o   The jury hearing, through testimony connected to Government Exhibit 50-2(m), that the Office of the Comptroller of the Currency considered the program a scam, by including the OCC warning about an unrelated product in an email;

A snapshot of similar testimony below shows just how ludicrous this streaming hearsay has become:

> Somebody had sent an e-mail originally -- I don't know who, client or rep, to Chad Wickline about the subject that was called investigation. It was sent in October of '04. And then Chad had forwarded it to myself, Dan, and Mark Browning, and it seems like the contents of the letter is that he heard that the government/IRS is investigating credit card debt elimination programs. Supposedly, Liberty Resources and a company with the word, quote, unquote, green are included among them in this investigation. And then it basically goes on with his personal story about another company that was investigated or whatever.

*Transcript of June 30, 2008*, Testimony of Mike Amato, p.49: 8-18.

So "somebody" that "I don't know who" sent something that was "called investigation" and it "seems like" the contents are something this "I don't know" purportedly "heard" from somewhere unidentified "that the government/IRS is investigating" and "supposedly" Liberty Resouces was "included" in this along with this "somebody, I don't know who" personal story about "another company" or "whatever." There are so many levels of hearsay in these emails, it is impossible to recount them all.

The testimony of these unknown federal judges, federal prosecutors, lawyers, identifying new co-conspirators and identifying a completely new scheme than that alleged in the indictment, violated the Wicklines' rights of confrontation of witnesses, the hearsay rules governing evidence, the right to a trial by jury only upon an indictment returned by a grand jury (given the extraordinary and material variance between the indictment and the evidence), and rendered this evidence severely prejudicial to the Wicklines, requiring the remedy of mistrial to give the Wicklines a meaningful and fair trial on the actual merits, not the gossip and rumors flowing into the record.

## IV.   THE COURT'S MISAPPLICATION RULE 403 ALLOWED CONFUSING & UNFAIRLY PREJUDICIAL EVIDENCE OF A COMPLETELY DISSIMILAR UNCHARGED CONSPIRACY & INFLAMMATORY BUT IRRELEVANT VICTIM IMPACT TESTIMONY.

### A.   *Unfair Prejudice Is Different From "Evidence" Which Is Probative Of Some Genuine And Proper Issue For Trial*.

Rule 403 precludes even probative evidence if the evidence runs a substantial risk of unfairly prejudicing or unduly confusing the jury. Prejudice, in its truest sense, is not "harmful." Instead, it means "to lean in favor of one side or cause for some reason or other than its justice." *See http://www.legal-dictionary.biz/PREJUDICE-definition/*; *see also http://legal-dictionary.thefreedictionary.com/prejudiced*. These colloquial understandings find expression in the more nuanced court opinions. *See United States v. Figueroa*, 618 F.2d 934, 943 (2d. Cir. 1980). The federal appellate court for the Second Circuit Court of Appeals noted the common lower court misunderstanding that "everything that is introduced against a defendant in a criminal case is prejudicial," criticizing this misconception of the rule. *Id*. at 943. Adverse evidence is always probative, but adverse evidence is not always "prejudiced" evidence. All evidence has multiple possible inferences, and not all inferences from any item of evidence will

14

be probative.  Evidence is prejudicial when some ancillary inferences from the evidence run an undue risk of the juror to have some adverse effect on the defendant beyond proving the fact or issue the particular evidence is probative of, such as evidence that could cause logical errors in assessing the case or emotive reactions that blind effective use of logic.

At all times, in the criminal context, the Constitutional requirement for a fair trial and the unique federal supervisory power over its judicial process further inform the evidentiary analysis. "By far the most important consideration is the impact of any [evidentiary] error upon the right of the defendants to a fair trial." *United States v. Reed*, 647 F.2d 678, 687 (6th Cir. 1981). The *Reed* court recognized that "[t]he admission of evidence of other wrongful acts, prior misconduct or bad reputation . . . [is] fraught with great risk to the fairness of the trial." *Id*. The Sixth Circuit views such propensity evidence in criminal cases as deeply suspect. "A fundamental rule of evidence is that a defendant's 'bad character' cannot be used to argue that the defendant committed the crime for which he is being tried, or had the propensity to commit that crime." *Washington v. Hofbauer*, 228 F.2d 689, 699 (6th Cir. 2000) (citing Fed. R. Evid. 404(a)). Consequently, the courts compel both relevance and necessity of such evidence. *Reed*, 647 F.2d at 687.

In this case, that prejudiced evidence is two-fold:  (a) inferences from evidence that could convince the jury the defendants should be convicted *not* for conspiring *against* and defrauding their clients, but for conspiring *with* their clients against the credit card companies and defrauding not their clients but the credit card companies; and (b) emotive reactions and inflamed passions from evidence that could convince the jury the clients' suffering warrants criminal punishment even if the suffering was not even known to defendants nor part of their intent.

15

B. *The "Scam" Identified by the Judge, Followed Up By Similar BMW and Internet Provider Credit Card Payment Evidence is Not the Scam Alleged in the Indictment, Creating Both Unfair Prejudice & Undue Confusion to the Jury.*

The email (Government Ex. 50-2(bb)) was used to further explain what the federal judge said the "scam" was – a scam not alleged in this indictment and that would reverse this indictment on its head. The more the jurors believe that Chad truly believed what he was telling clients was true in good faith (you can eliminate your credit card debt, and thus innocent of all charges in the indictment) the more the jury will believe he was conspiring with them and others to defraud the credit card companies by making credit card charges with no intent to pay it back based on his theory you can eliminate it. The jury has heard extensive evidence, including hearsay in email, BMW documents, internet service provider documents, and hotel bills, surmised by the same scandalous email objected to on hearsay and 403 grounds:

Q:     Who is this e-mail from?
A:     This e-mail is from Michael Burgess.
Q:     And who is Michael Burgess again?
A:     Michael Burgess is the gentleman who represented himself as the attorney for his company to confirm the awards.
Q:     All right. What is he telling Mr. Davis?
A:     You know, basically, that all 1100 files or awards that were submitted to the judge were rejected outright, that his company spent an abundant amount of money that he will not be able to recoup; therefore, he is contemplating shutting his company down.
Q:     All right. Why did he indicate that the awards were not confirmed?
A:      The judge viewed them as a scam.

*Transcript of June 30, 2008*, Testimony of Mike Amato, p.57: 8-21 (reading from email).

Q:     Now let's go on to the second -- what does he say there at the last paragraph?
A:     He said, in quotes: ...so these people went out with the credit cards that they had themselves applied for, signed their name to get those cash advances, stereos, furniture and clothing, computer equipment, etcetera, then they found that they couldn't pay the bill. So they decided to arbitrate so that they could weasel out of paying these high -- these very legal bills.

> Well, no way in hell they are getting any money for that from this court.
> End quote.
>
> Q:     And was he referencing the awarding of monetary damages there?
> A:     Yes, he was.

*Id. at* p.58: 8-21 (reading from email).

He goes on to read from the email with Attorney Burgess also calling it a "whole scam" (p.60: 24) after the witness surmised the email was saying the federal judge called it a "scam." This "scam" alleges the conspiracy involves a whole host of other people completely unrelated to this case (all read into the record through the email and witness) and the scheme identified is a completely different scheme – to conspire with clients against credit card companies to help clients defraud credit card companies.

The BMW evidence was used for a comparable purpose, concerning cash advances run up against credit card companies just prior to seeking to eliminate the credit card debt; the internet invoices equally run afoul of the same, showing credit card payments by Mark Browning for internet services while seeking to eliminate the debt; and the invoices from hotels infers the same, documenting credit card payments while seeking elimination of credit card debts. The prosecutor's repeated emphasis on the money award damages portion of the arbitration awards and post-Hawkins changes related thereto emphasized this approach, engendering the impermissible evidentiary inferences in the minds of the jury – that the "scam" was that they actually believed what they were telling clients was true, as to defraud the banks.

Indeed, this was the immediate conclusion of the bank's attorney upon seeing this evidence and Prosecutor Brown conceded the same inferences could be drawn:

> I mean, you could, I suppose, always argue that what they're really doing is defrauding all the banks involved, because all of the credit cards had charges run up on them to varying degrees. And the truth of the matter is that Chad Wickline's was at the low end of that charges being run up. Ms. Pedersen seems to be at the

17

high end of that, $500,000. Yeah, I suppose it could be argued on every one of these situations that this is bank fraud. That's not the charge.

*Transcript of July 2, 2008*, Assistant United States Attorney Dan Brown, p.7: 12-22.

The fact Prosecutor Brown does not intend to make that his express argument is irrelevant. It does not matter if no prosecutor expressly says so to the jury. Rule 403 is not about what the prosecutor's "purpose" is in the evidence; 403 is all about what inferences the *jury* could draw from the evidence and whether those inferences could lead to either unfair prejudice or undue confusion, both substantial and severe here. As is, the jury has heard that a federal judge described the "scam" as just that. This alone is severely prejudicial, an error of evidence that failed the test of 106, 803(6), and 403.

C.   The Inflammatory, and Often Perjured, "Victim Impact" Evidence is Severely Prejudicial.

The victim impact evidence (which has been demonstrated to often be nothing short of outright perjury) is equally problematic, intended to inflame the passions and sympathies of the jury to punish the defendants for the usually unknown personal woes of the customer.  "The government need only charge that the defendant intended to defraud the victim of money or property, not that the victim was actually deprived of money or property." *United States v. Rayborn*, 495 F.3d 328, 338 (6th Cir. 2007).  Hence, what happened to the property of the alleged victim is simply irrelevant. This is particularly true as to where the victim acquired the funds to pay Liberty, a fact usually unknown to the defendants, and as to the subsequent financial impact on the victims beyond the fact the debts were not eliminated.

The Third Circuit identified the same misuse of victim testimony in a mail fraud case, when the evidence went beyond the relevant fraud aspects (here, the relevant aspects are the

existence of the debt and the non-elimination of the debt; everything else, is pure inflammatory evidence). *See United States v. Cobble*, 24 F.3d 535 (3rd Cir. 1994).

> **Some of the victim impact testimony went beyond anything that was reasonable to prove Copple's specific intent to defraud. A number of the funeral directors testified that the money they had used to pay back the losses came from money they had saved for their children's college educations. Others testified that paying back the money had affected their health, or had been taken from savings dedicated to other special purposes**…**Terry Starr testified that he had to use every bit of personal savings he had in order to retrust the lost money**. He then stated that, in order to obtain the money, he and his wife were forced to break a contract to purchase a home and to use the down payment money to retrust the money they had lost. **Testimony such as this had either no, or very little, probative value and was unfairly prejudicial….**to highlight the personal tragedy they had suffered as **victims of the scheme. The testimony was designed to generate feelings of sympathy for the victims and outrage toward Copple for reasons not relevant to the charges Copple faced. It arguably created a significant risk that the jury would be swayed to convict Copple as a way of compensating these victims wholly without regard to evidence of Copple's guilt. In short, we believe that the probative value of the victim impact testimony was outweighed by unfair prejudice, and that such testimony should have been excluded under Federal Rules of Evidence 403.**

*Id*. at 445-46 (emphasis added).

This is exactly the case here, but even worse, since the problems complained of by the customers were *inevitable* even *without* Liberty Resources due to the customer's credit plight, with customers talking about taking government checks from dying mothers to pay the bills, Montana elder women talking about going without heat in winter, witnesses speaking of begging parents for last minute bail out loans and talking of lost dreams and lost businesses.[1]

As this Court previously explained, such victim impact evidence (in that instance, a death penalty case) should be excluded from the trial on guilt and reserved for sentencing issues if

---

[1] Of course, the fact that much of this testimony is manifest perjury only further taints the trial proceedings. The Montana witness apparently owes about $250,000 in properties, foreclosing any "can't go with heat in winter" excuse while Mr. Davis' story of borrowing from his cancer-ridden mother's government check is patent perjury given his wife's substantial business interest in the market, his $200,000 home and his apparently well-paying job at the University of Northern Arizona. None of this was disclosed as Brady material and the defense is only now discovering much of it.

convicted.  *See United States v. Mayhew*, 380 F.Supp.2d 936 (S.D. Ohio 2005) (Marbley, J.,

presiding).  As this Court then articulated, the "Court agrees with *Davis* and *Johnson* and will

bifurcate the sentencing phase on the theory that victim impact evidence has no probative value

with regard to the statutory aggravating factors or the mens rea requirement in this case, but that

such evidence carries with it a substantial risk of prejudicing the jury."  *Id*. at 957.

Yet, this court, as it did with de-contextualized evidence erroneously excluded from Rule

106's embrace and as it did with unbridled hearsay claims of statements attributed to federal

judges and lawyers referencing "scam" in contravention of rule 803(6), not only permitted this

evidence, but walked across the court with something to wipe witness' eyes while testifying,

These evidentiary errors alone constitute severe prejudice; in their aggregate, they make a trial

on the merits too unlikely for anything but a mistrial to be ordered.

## CONCLUSION

In light of the above detailed recitation of the severely prejudicial error, error precipitated

by multiple errors of the rules of evidence violating the Wickline's constitutional rights to

confrontation of witnesses, trial on the indictment returned by the grand jury and by an impartial

jury on the probative but not unfairly prejudicial evidence, and the right to due process, errors

precipitating unflinching and unfairly prejudicial evidence, perjured testimony, and confused

jurors that now pervades the record in these proceedings, the Wicklines move for an immediate

mistrial.

Respectfully submitted this 6th day of July, 2008.

THE BERNHOFT LAW FIRM, S.C.
Attorneys for the Defendant, Chad Wickline

By:      /s/ Robert G. Bernhoft
            Robert G. Bernhoft

207 East Buffalo Street, Suite 600
Milwaukee, Wisconsin 53202
(414) 276-3333  telephone
(414) 276-2822  facsimile
bhmahany@bernhoftlaw.com


ROSS BABBITT CO., LPA
Attorney for the Defendant, Dan Wickline

By:      /s/ Ross Babbitt
            Ross Babbitt

700 St. Clair Avenue
Hoy Block, Suite 300
Cleveland, Ohio 44113
(216) 623-6346  telephone
(216) 274-9683  facsimile
rbabbitt@babbitt-lawfirm.com

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

|  |  |  |
|---|---|---|
| UNITED STATES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 2:07-CR-121 |
| v. | ) | |
| | ) | |
| CHAD WICKLINE | ) | |
| DAN WICKLINE | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

IT IS HEREBY CERTIFIED that true and correct copies of the foregoing document and attachment were served via the Court's ECF system to opposing counsel or parties at the following e-mail addresses:

| Opposing Counsel | E-mail address |
|---|---|
| Asst. U.S. Attorney Marcia Harris | marcia.harris@usdoj.gov |

Dated on July 6th, 2008.

_/s/ Bret Tollefson_____
Bret Tollefson