UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES, | ) |
| Plaintiff, | ) Case No. 2:07-CR-121 |
| v. | ) |
| CHAD WICKLINE and DAN WICKLINE | ) JUDGE ALGENON MARBLEY |
| Defendants. | ) |

**DEFENDANTS' MOTION TO DISMISS THE
INDICTMENT, OR ALTERNATIVELY, TO COMPEL
PRODUCTION OF ALL GRAND JURY TRANSCRIPTS IN THIS CASE**

COME NOW Defendants Chad Wickline and Dan Wickline (hereinafter the "Wicklines"), by and through their respective attorneys of record, The Bernhoft Law Firm, S.C. and Ross M. Babbitt Co. LPA, and file this motion to dismiss the Indictment or, in the alternative, compel the prosecution to produce all Grand Jury transcripts in this case. The Indictment should be dismissed because of prosecutorial misconduct before the Grand Jury. Alternatively, the Grand Jury transcripts should be produced because of a disturbing pattern of grand jury abuse in the several transcripts already provided to the defense, combined with an equally disturbing pattern of prosecution misrepresentations regarding material discovery and other important matters in this case. If the Court denies this motion to dismiss, only a complete defense review of all Grand Jury transcripts will protect the Wicklines' Fifth and Sixth Amendment rights to a fair trial, as well as insure the perception and actual integrity of the judicial process.

1

The grounds for this motion are threefold.  First, IRS CI Special Agent Liberto testified falsely before the grand jury regarding a material matter of which he had knowledge.  Second, the prosecution misled the indicting grand jury by introducing substantial evidence and testimony regarding an uncharged alleged conspiracy between the Wicklines and their customers to defraud banks and credit card companies.  Third, the prosecution intentionally introduced irrelevant, highly prejudicial and inflammatory testimony regarding the apparent crime of "Tax Protesting", and impermissibly argued that the Wicklines' credit card debt elimination product was analogous to the apparent crime of tax protesting or holding "tax protestor" beliefs.

Each instance of aforementioned prosecutorial misconduct and/or grand jury abuse stands individually sufficient to warrant disclosure of all Grand Jury transcripts, but taken together, compel dismissal of the indictment for irreparably infecting the grand jury's decision-making process, by undermining the grand jury's ability to make an informed and objective evaluation of the evidence presented to it.  At all events, an order compelling production of these items is necessary, for only upon the production and defense review of all the grand jury transcripts can it be ascertained whether this criminal trial proceeding has been infected by an irreparably tainted indictment.  The Wicklines' have unassailable Fifth and Sixth Amendment rights to a fair trial, but the prosecution's grand jury abuse, sharp practice, and illicit discovery concealment and gamesmanship have placed those fundamental rights squarely in jeopardy.

**Legal Standard**

The Supreme Court reminded all courts that the integrity of justice depends on more than mere convictions, "since it is as much [the government's] duty to refrain from improper methods calculated to produce wrongful conviction as it is to use legitimate means to bring about a just one."  *Berger v. United States*, 295 U.S. 78, 88 (1935).  "Governmental 'investigation' involving

participation in activities that result in injury to the rights of its citizens is a course that courts should be extremely reluctant to sanction." *Hampton v. United States*, 425 U.S. 484, 493 n.4 (1976) (Powell, J., concurring).

> Along with illegal search and seizures, wire tapping, false arrest, illegal detention and the third degree, it is a type of lawless law enforcement. They all spring from common motivations. Each is a substitute for skillful and scientific investigation. Each is condoned by the sinister sophism that the end, when dealing with known criminals or the 'criminal classes,' justifies the employment of illegal means.

Donnelly, *Judicial Control of Informants, Spies, Stool Pigeons, and Agent Provocateurs*, 60 Yale L.J. 1091, 1111 (1951). "All these methods are outlawed, and convictions obtained by means of them are invalidated, because they encourage the kind of society that is obnoxious to free men." *Walder v. United States*, 347 U.S. 62, 65 (1954).

The "proper standards for the enforcement of the federal criminal law in the federal courts" requires district courts utilize their power to dismiss charges whenever community standards and lawful order compel the same. *McNabb v. United States*, 318 U.S. 332, 341 (1935). The judiciary stands as the only barrier to unjust enforcement of the law by lawless means. Public confidence in the fair and honorable administration of justice is the true transcendent value at stake, much more than the fate of an individual conviction before the court. In asserting the supervisory power over the criminal process, the principal concerns are protecting the "community's sense of fair play and decency," and not rewarding prosecutorial or investigative methods that tend "to discredit law and thereby to brutalize the temper of a society." *Rochin v. California*, 342 U.S. 165, 173-174 (1952).

## **Supervisory Power**

A court may dismiss an indictment for prosecutorial misconduct on constitutional due process grounds. *See United States v. Griffith*, 756 F.2d 1244, 1249 (6th Cir. 1985). If the

conduct does not rise to the level of a due process violation, the court may nonetheless dismiss under its supervisory powers. *See id*.

The right of a federal court to use its supervisory power to dismiss an indictment on the basis of government misconduct is beyond cavil. *See United States v. Nembhard*, 676 F.2d 193 (6th Cir. 1982). As well, to invoke a court's supervisory powers for purposes of dismissing an indictment in this Circuit, the defendant must also show "that 'prosecutorial misconduct is a long-standing or common problem in the grand jury proceedings in [the] district.'" *Griffith*, 756 F.2d at 1249 (quoting *Nembhard*, 676 F.2d at 200).

Courts determine when to exercise their supervisory power to dismiss an indictment on a case-by-case basis because the defendant must show actual prejudice. *See Griffin*, 756 F.2d at 1249. The three legitimate bases for the exercise of that supervisory power are: (1) to remedy a violation of a statutory or constitutional right; (2) to preserve judicial integrity; and (3) to deter future illegal conduct. *See United States v. Gjieli*, 717 F.2d 968, 978-79 (6th Cir. 1983).

> Prerequisite then to reversing a conviction under the supervisory powers, (1) there must be a constitutional injury which is personal to the complaining defendant, (2) the injury must "harm" the defendant in a legally significant way, (3) there must be an injury to the judicial system, (4) the "remedy" selected by the Court to preserve judicial integrity and deter future misconduct may not exceed established limitations on the court's power, and (5) the remedy selected must be narrowly tailored.

*Id*.

The federal courts use their supervisory power over the criminal process as their means of sanctioning and deterring prosecutorial misconduct. "[T]he power to exercise supervisory control over the prosecutor to protect the integrity of the judicial system remains." *United States v. Adamo*, 742 F.2d 927, 942 (6th Cir. 1984). The courts have used this power to limit evidence or dismiss indictments in many contexts, including reversal of a conviction supported by false

4

evidence in *Mesarosh v. United States*, 352 U.S. 1, 14 (1956), to punish improper practices by federal prosecutors in *United States v. Hale*, 422 U.S. 171 (1975) and *United States v. Means*, 513 F.2d 1329 (8th Cir. 1975), and to limit evidence at trial to curb the misconduct of governmental agents in *Mallory v. United States*, 354 U.S. 449, 455-456 (1957) and *Rea v. United States,* 350 U.S. 214, 217 (1956).

### Fifth Amendment Due Process

Dismissal of an indictment is also proper upon a violation of a defendant's Fifth Amendment rights caused by prosecutorial misconduct. A threshold requirement to an award of such relief is a showing of actual prejudice to the defendant resulting from the prosecutorial misconduct. *Griffith*, 756 F.2d at 1249. Furthermore, the misconduct must also taint the grand jury proceeding's decision-making process. As *Griffith* further explained, "[d]ismissal of the indictment based on the prosecutor's misconduct before the grand jury is warranted only where the misconduct 'undermined the grand jury's ability to make an informed and objective evaluation of the evidence presented to it.'" *Id*. at 1250 (quoting *United States v. Sears, Roebuck & Co.*, 719 F.2d 1386, 1391 (9th Cir. 1983)).

Dismissal of an indictment is the appropriate remedy where continuing prejudice from the constitutional violation cannot be remedied by another remedy, such as evidentiary exclusion (exclusion of witnesses or other evidence) or partial dismissal of certain counts in the indictment. *See United States v. Morrison*, 449 U.S. 361, 365-66 n.2 (1981).

The record before the Court mitigates strongly in favor of dismissal of the Indictment in this matter. In the event that the Court disagrees, the Wicklines request in the alternative that they be provided with a complete set of the Grand Jury proceedings with which they may further

vet the basis for this motion and thereby enjoy their Fifth and Sixth Amendment rights as they continue to mount their defense.

### Argument

I.  **SA Liberto's False Statements As To A Material Matter Irreparably Tainted the Indicting Grand Jury's Decision-Making Process And Requires Dismissal.**

IRS CI Special Agent Robert Liberto (hereinafter "SA Liberto") testified three times before the indicting grand jury. (Grand Jury Proceedings of September 26, 2006, May 21, 2007, and May 29, 2007, attached respectively hereto as Exhibits A, B, and C.)[1]  During his testimony of September 26, 2006, upon the examination of DOJ Tax Division Attorney Richard Rolwing, SA Liberto testified regarding alleged false testimonials and success assurances on the Liberty Resources web site.  This testimony went directly to the crucial matter of the placement timing of that advertising on the web site and when Attorney Hawkins could have had knowledge of that web site advertising.  At bottom, this testimony goes to the core issue of whether the Wicklines conspired to concoct false testimonials after Attorney Hawkins' departure – an argument that the prosecution created to increase the appearance of culpability:

> Q:  But what happened with their involvement with Hawkins in late '03, early '04?
>
> A:  Well, after they initially started marketing the credit card debt elimination process through the web site, which started in the latter half of 2003, at the very end of 2003, which would be December or January of 2004, they split from Hawkins.  They went and formed their own company selling his product under their name.
>
> Q:  All right. Now, they --at first they were marketing the scheme and getting a cut from Hawkins?
>
> A:  That's correct.
>
> Q:  They were marketing his scheme?

---

[1]  Because the exhibits are greater than two megabytes in size, the exhibits are split into several segments as suggested by paragraph IV-A-2 of the ECF Policy and Procedures Manual.

A:  Yes.

Q:  And then they decided to do it on their own?

A:  Right.

**Q:  And that's when they put these testimonials on their own web site?**

**A:  Right.  When the split was coming from Hawkins is when the testimonials appeared on the web site, yes.**

Q: And Amato had actually tried Hawkins' credit card debt elimination scheme and it was not working?

A:  Right.

**Q:  But he put this false testimonial on the web site and started promoting it independently?**

**A:  Right, right…**

(Liberto Grand Jury testimony of September 26, 2006, 27:16-28:15, Ex. A) (emphasis added).

Q:  All right.  And so they break with Hawkins, they say your product does not work, my credit cards are still in dispute. What does Hawkins say when he looks at their web site?

A:  Well, there was a separate e-mail on February 2nd where Mr. Hawkins raises some concerns over over-exaggerations and the falseness in the – in the web site, things in the web site that aren't true.

Q:  And he tells the people at Liberty Resources, that is Wickline, Amato, Browning, that you better watch out, these statements on your web site are going to come back to haunt you?

A:  Right.  And at that point the Liberty Resources web site said they had – they had a lawyer associated with them. And Hawkins points out, well, I don't know what lawyer you're referring to, but it's not me.

*Id.*, p. 29:2-16.

Q: Right.  Now, Mr. Hawkins, you said sent them an e-mail after looking at their web site.  And I believe you said it was like at the beginning of February?

A:  Right, that's correct.

*Id.*, p. 30:12-15.

> Q: And Bruce Hawkins' February e-mail expressing concerns about their web site, specifically why don't you go into just a little bit of detail about what his concerns were, if you remember.
>
> A: I remember he had an issue with the hundred percent guarantee or hundred percent successful. And meaning that, you know, that's something that you can't really claim, because it's – it's not true. And then also credit card debt elimination is an over exaggeration, because it's – it's a process, it's a fight, it's a litigation.

*Id.*, p. 30:25-31:10.

As both of the prosecuting attorneys and SA Liberto were well aware, however, the testimonials and success assurances were placed on the Liberty Resources web site some five months earlier, in mid-October 2003, while Liberty Resources was marketing directly for the Hawkins Law Firm. SA Liberto testified falsely that Amato put false testimonials on the web site in late January or early February of 2004 in preparation for the "split" with the Hawkins Law Firm and against Attorney Hawkins' explicit advice and warning. Additionally, a web site marketed for Hawkins had the same precise testimonials on that website in the fall of 2003. This false testimony placed criminal intent before the grand jury as to the Wicklines and disconnected them from reliance on Attorney Bruce Hawkins, thereby irreparably infecting the grand jury's decision-making process.

**II.    The Prosecution Misled the Indicting Grand Jury By Introducing Substantial Evidence And Testimony Regarding An Uncharged Alleged Conspiracy Between The Wicklines And Their Customers To Defraud Banks And Credit Card Companies.**

As set forth in the Wicklines' motion in limine, (Doc. 97), the prosecuting attorneys elicited substantial testimony before the indicting grand jury of an uncharged conspiracy between the Wicklines and their customers to defraud banks and credit card companies. This substantial body of testimony put before the Grand Jury evidence which, if true, would tend to unfairly

8

prejudice the Wicklines in the Grand Jury's eyes in a manner irrelevant to the conspiracy as charged.

This evidence largely mirrors the unindicted conspiracies set out in Section IV-A in the contemporaneously-filed Motion For Mistrial. (Doc. 99.) In sum, the Grand Jury heard lines of questioning that went to whether the Wicklines were involved in a conspiracy with their customers to defraud the banks. This is completely separate and apart from the indicted conspiracy of the Wicklines to defraud their customers by selling them the Liberty Resources program which the government claims the Wicklines knew did not work at the time of sale.

As set out in the aforementioned motion in limine, "…grand jury transcripts disclose this line of questioning from the prosecutor to the special agent identifying the 'theme' of the scheme as 'you [the customer] can go out and run up a bunch of credit card debt, and then just file these papers and get rid of [the debt].'" This narrative recapitulates SA Liberto's September 26, 2006, testimony:

> A: I think it's a variation of the same the same theme, that you can get a mortgage and with various submit various forms of paperwork and that you could eliminate the mortgage.Therefore you could go buy' a house, file this paperwork, and then get your house free and clear and not owe a mortgage on it.
>
> Q: And so that was kind of the same theme that you can go out and run up a bunch of credit card debt, and then just file these papers and get rid of them?
>
> A: That's correct.
>
> Q: Go out buy a house, take a loan out with the bank, get a mortgage, file this paperwork and now you have your house free and clear with no mortgage?
>
> A: That's correct.
>
> Q: Okay. And is this again a – a representation or a belief held by certain people in the United States who have a problem with national banks and taxes?

      A:  That is correct.  It's more of like the big banks are out here to take advantage of us. And therefore, you know, here's this loop hole that we can use, so that we don't have to pay debt that they say we owe them.

(Liberto Grand Jury testimony of September 26, 2006, 33:5-34:1, Ex. A).

With this testimony, the government, through its chief agent in this case, tainted the Grand Jury with testimony that went to the Wicklines and their customers defrauding banks.  What is more, SA Liberto took it upon himself to editorialize on motives he attributes to the Wicklines – specifically that the Wicklines and their co-conspirators (their clients) were out to get the "big banks" in retaliation for some perceived sleight.  The sheer eagerness with which SA Liberto paints the Wicklines as fraudsters attacking the banking industry, despite the fact that such allegations are completely irrelevant to the Indictment before him, is very troubling.  Most importantly, though, Liberto's testimony to the Grand Jury irretrievably contaminated the Grand Jury proceedings.  *The more innocent the Grand Jury found the Wicklines' intent toward their clients – e.g., that the Wicklines really wanted to and believed they could eliminate their customers' credit card debts – the more guilty of the uncharged conspiracy of defrauding the banks instead, by running up debts intended to be later eliminated and not repaid.*

**III.**    **The Prosecution Intentionally Introduced Irrelevant, Highly Prejudicial And Inflammatory Testimony Regarding The Apparent Crime of "Tax Protesting", and Impermissibly Argued that the Wicklines' Credit Card Debt Elimination Product was Analogous to the Apparent Crime of Tax Protesting.**

      In truly over-the-top fashion, the government went so far as to pollute the Grand Jury proceedings with a lengthy narrative by SA Liberto drawing parallels between the Wicklines and a vague, but menacing, group of "tax protesters".  The complete irrelevance of this testimony to the indictment is itself the best evidence of Liberto's and the government's intention in putting it to the Grand Jury in the first place.  That is, "tax protestors" are bad, the Wicklines are "tax protestors", therefore the Wicklines are bad.

In pertinent part, the chief law enforcement investigator in this matter felt it necessary to inform the Grand Jury as follows at p. 13:21-15:2.

> Q: Now, this entire concept of banks not being permitted to loan people money via a credit card, that kind of thought process, is it familiar to you to – attributable to a certain group of people that have problems with taxes here in the United States?
>
> A: Yes. Being in the IRS I actually investigate tax crimes as well, and the argument that Liberty Resources was – was forwarding is analogous to like a tax protester argument, versus like this law is unconstitutional, or there is this loop hole and therefore you don't have to pay. In income tax cases usually it's the scheme is run by like a tax promoter. So then you would pay him the money, he tells you how to get out of paying your taxes. In this case you pay your money to Liberty Resources and they would show you how to not pay your credit cards.
>
> Q: (By Mr. Rolwing) For instance some of the tax promoters might educate their so-called clientele that they are sovereign citizens and the IRS does not have jurisdiction over them, so they don't need to pay taxes?
>
> A: Right. That's one of the arguments. There's many, but that's one of them.
>
> Q: You're saying that's sort of just analogous to the promotion that was going on here that, hey, the law for national banks does not allow them to issue credit cards, so you don't have to pay your debt when you get your credit card?
>
> A: Right. The common theme through both of those type(s) of investigations is like a misstatement of the law, tax protesters – they are misstating the law, and the credit card debt eliminations, they are misstating the law. And they base their whole argument on the foundation is a misstatement of the – of the law.

(Liberto Grand Jury testimony of September 26, 2006, 13:21-15:2, Ex. A).

And he continued:

> Q: Okay. And is this again a – a representation or a belief held by certain people in the United States who have a problem with national banks and taxes?
>
> A: That's correct. It's more of like the big banks are out here to take advantage of us. And therefore, you know, here's this loop hole that we can use, so that we don't have to pay debt that they say we owe them.

*Id.*, p. 33:30-34:1.

That anyone working on behalf of the government thought it was appropriate, let alone permissible under any interpretation of the law, to elicit this testimony is shocking. The government clearly took the low road with this line of questioning, and had a federal agent advise the Grand Jury that the Wicklines were tax protesters, with the implication that, as such, they should be indicted on those grounds, rather than the relevant issues.

In sum, this Court should dismiss the Indictment outright due to the multiple, clear instances of prosecutorial misconduct before the Grand Jury. The Wicklines' Fifth and Sixth Amendment rights were not even a consideration in the face of the government's zeal to secure an indictment. And the evidence is manifest that the Grand Jury heard: (1) false statements from the lead IRS special agent, elicited by the prosecution, concerning the timing of the posting of the testimonials on Liberty Resources' website; (2) testimony from SA Liberto that the Wicklines were conspiring with their customers to defraud the banks against which they had an irrational grudge; and (3) testimony from SA Liberto that the Wicklines were "tax protestors" with fringe ideas in a clear effort to make them appear to be part of some criminal underclass.

In the event that the Court does not dismiss the Indictment, the Wicklines respectfully urge that the Court order the government to turn over all transcripts of the proceedings before the Grand Jury so that they may fully vet them consistent with this motion.

Respectfully submitted this 6th day of July, 2008.

        THE BERNHOFT LAW FIRM, S.C.
        Attorneys for the Defendant, Chad Wickline

        By:    /s/ Robert G. Bernhoft
              Robert G. Bernhoft

        207 East Buffalo Street, Suite 600
        Milwaukee, Wisconsin 53202
        (414) 276-3333  telephone
        (414) 276-2822  facsimile
        rgbernhoft@bernhoftlaw.com

        ROSS M. BABBITT CO., LPA
        Attorney for the Defendant, Dan Wickline

        By:    /s/ Ross M. Babbitt
              Ross M Babbitt (0072946)

        700 St. Clair Avenue
        Hoy Block, Suite 300
        Cleveland, Ohio 44113
        (216) 623-6346  telephone
        (216) 274-9683  facsimile
        rbabbitt@babbitt-lawfirm.com

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Case No. 2:07-CR-121 |
| v. ) | |
| ) | |
| CHAD WICKLINE and ) | JUDGE ALGENON MARBLEY |
| DAN WICKLINE ) | |
| ) | |
| Defendants. ) | |

**CERTIFICATE OF SERVICE**

IT IS HEREBY CERTIFIED that true and correct copies of the foregoing document and attachment were served via the Court's ECF system to opposing counsel or parties at the following e-mail addresses:

| Opposing Counsel | E-mail address |
|---|---|
| Asst. U.S. Attorney Marcia Harris | marcia.harris@usdoj.gov |

Dated on July 6, 2008.

/s/ Robert G. Bernhoft
Robert G. Bernhoft